NORTHFIELD PARK ASSOCIATES, APPELLEE, *v.* NORTHEAST OHIO HARNESS ET AL., APPELLANTS.

(Nos. 50758, 50788 and 51383—
Decided February 10, 1987.)

*Cavitch, Familo & Durkin Co.,
L.P.A.,* and *Michael C. Cohan,* for appellee Northfield Park Associates.

*Brian A. Bash,* for appellants Grandview Raceway and Victor D. Ippolito.

*Eli Manos,* for appellant Northeast Ohio Harness.

*Glenn Waggoner,* for appellants Loren W. Houston and Robert D. Stakich.

HOFSTETTER, J. Northfield Park Associates (hereinafter referred to as ("Northfield") is an Ohio partnership. Northfield owns the Northfield Park Harness Racing Track, which is located partially within the village of Northfield in Summit County and partially within the village of Walton Hills in Cuyahoga County.

At all times pertinent to the appeals before us, Northfield had leases with several different entities for the use of the track and its facilities. One lease entitled Grandview Raceway (hereinafter referred to as "Grandview") to operate one meet per year, alternating each successive year between the summer meet and the fall meet. A meet is simply a period of days during which racing is conducted at the track. The number of days of each meet is regulated by the Ohio State Racing Commission pursuant to R.C. Chapter 3769.

Another lease initially entitled the Painesville Raceway (hereinafter referred to as "Painesville") to operate one meet per year, alternating each year between the spring meet and the fall meet. In November 1981, Painesville assigned all its rights under its lease with Northfield to Northeast Ohio Harness, an Ohio partnership (hereinafter referred to as "Northeast").

Northeast also had a lease of its own directly with Northfield. Northeast was to operate two meets per year. It was to operate the winter meet each year, and the spring and summer meet every other year, alternating with Painesville and Grandview respectively. Since Northeast obtained Painesville's rights under the Paines-

ville lease in 1981, however, it thereafter had the right to operate three meets each year.

Under the terms of its lease with Northfield, Northeast agreed to assume full responsibility for the operation of the track. The lease specifically required Northeast to pay "all costs and expenses of operating Northfield Park," except for the payment of real estate taxes, which remained the obligation of Northfield as lessor. Northeast was also required to cause Grandview and Painesville to perform their duties and obligations as to repairs, maintenance and operation of the track under their respective leases.

Throughout the term of the Northeast lease, Northfield had concerns about certain alleged breaches of the leases by the various lessees. On November 9, 1984, Carl Milstein, a general partner of Northfield, decided to reenter and take possession of the Northfield Park premises. He did so accompanied by two security guards, at least one of whom was armed with a firearm. On the same day, Milstein made provisions to have the locks on the premises changed. Although two employees of Northeast were present when Milstein arrived at the premises, they offered no resistance to his actions.

Milstein relied upon certain "self-help" provisions contained in each of the leases when he acted to retake possession of the racetrack. He had not pursued a forcible entry and detainer action under R.C. Chapter 1923.

On November 13, 1984, the first business day following Milstein's takeover, Northfield filed suit against Northeast and its four general partners, seeking damages for breach of lease and an injunction to prevent the defendants from interfering with Northfield's possession and operation of the racetrack. On November 29, 1984, Northfield filed an amended complaint, adding Grandview as a defendant.[1] The amended complaint requested as additional relief a declaration by the trial court terminating all three leases.

Northeast answered the complaint and filed a counterclaim against Northfield, seeking monetary damages and injunctive relief. Grandview also filed a counterclaim, setting forth several claims for relief, including breach of lease and trespass.

After a lengthy trial to the court,[2] the court below rendered judgment in favor of plaintiff on all its claims and on the counterclaims presented by the defendants.

There are now three appellate cases before us, which have been consolidated for review, arising from the single case below. Case No. 50758 is the appeal by Northeast from the judgment of the court below, while case No. 50788 is a like appeal by Grandview. Case No. 51383 is a joint appeal by Northeast and Grandview from post-appeal action by the trial court enforcing its judgment against these defendants.

Northeast assigned the following errors by the trial court in case No. 50758:

"1. The trial court erred in granting judgment to NPA upon the trespass counterclaim of NEOH, in that NPA's re-entry to the Northfield Park

---

[1] A claim was also set forth naming Sportservice Corporation as an additional defendant, but this claim was later dismissed.

[2] The trial spanned a period of approximately four weeks. The trial transcript is approximately two thousand pages in length and there were approximately two hundred exhibits offered and admitted into evidence.

premises without court order constituted trespass and a usurpation of legal process.

"2. The trial court erred in finding that NPA complied with the notice requirements of the NEOH and Painesville leases in re-entering the premises.

"3. The trial court erred in failing to find that NPA waived any right of re-entry and forfeiture of the NEOH and Painesville lease, by continuing to accept subsequent rent under each lease after occurrence of alleged breaches.

"4. The trial court erred in failing to declare that only NEOH may conduct the Painesville meet at Northfield Park and that NPA has no right to apply for or operate the Painesville meet, and in denying NEOH's request to enjoin NPA from applying for and operating the Painesville meet.

"5. The trial court erred in awarding NPA damages for rent under the NEOH lease.

"6. The trial court erred in granting NPA judgment against NEOH for damages based on unpaid totalizator rent.

"7. Assuming, *arguendo,* that the NEOH lease was properly terminated by NPA for breach upon proper written notice, there was no such lawful termination of the Painesville lease and the trial court erred in finding for NPA on NEOH's counterclaim for trespass with respect to this lease.

"8. The trial court erred in ordering that NEOH transfer a liquor permit to NPA."

Grandview has presented the following assignments in case No. 50788, many of which parallel those set forth by Northeast:

"1. The trial court erred in granting judgment to NPA upon the counterclaim of Grandview, in that NPA's re-entry to the Northfield Park premises without court order constituted trespass and a usurpation of legal process.

"2. The trial court erred in finding that NPA complied with the notice requirements of the Grandview lease in re-entering the premises.

"3. The trial court erred in failing to declare that only Grandview could conduct its meet at Northfield Park and that NPA has no right to apply for or operate the Grandview meet, and in denying Grandview's request for damages and injunction relief in connection with the operation by NPA of the Grandview meet.

"4. The trial court erred in awarding NPA damages including interest at the prime rate under the Grandview lease.

"5. The trial court erred in granting NPA judgment against Grandview for damages based on unpaid totalizator rent.

"6. The trial court erred in allowing NPA to amend its pleadings to conform to the evidence regarding the claims for purses by NPA against Grandview.

"7. The trial court erred in admitting the testimony of the accountant regarding the alleged outstanding indebtedness owed by Grandview to NPA.

"8. The trial court erred in not awarding Grandview punitive damages for the wrongful acts of NPA."

Where appropriate, we will address allied assignments of error of Grandview and Northeast collectively. When necessary, we will address those pertaining to only one of the appellants separately.

Both of the defendants-appellants, in their first respective assignments of error, call to question the propriety of the action of the lower court in granting judgment to the plaintiff on its counterclaims for trespass. They argue plaintiff had no authority to enter the

premises, absent a court order authorizing it to do so.

First, we must examine the definition of trespass to ascertain whether either of the appellants was entitled to bring an action in trespass against the plaintiff, assuming *arguendo* that it acted without authority in entering the Northfield Racetrack premises on November 9, 1984.

"A 'trespasser' may be defined as one who unauthorizedly goes upon the private premises of another without invitation or inducement, express or implied, but purely for his own purposes or convenience; and where no mutuality of interest exists between him and the owner or occupant." *Keesecker* v. *G.M. McKelvey Co.* (1943), 141 Ohio St. 162, 166, 25 O.O. 266, 268, 47 N.E. 2d 211, 214; *Allstate Fire Ins. Co.* v. *Singler* (1968), 14 Ohio St. 2d 27, 43 O.O. 2d 43, 236 N.E. 2d 79.

To prevail on a claim of trespass, the claimant must prove he had possession of the subject premises at the time of the trespass. *Beggs* v. *Thompson* (1825), 2 Ohio 95, and *Rowland* v. *Rowland* (1837), 8 Ohio 40. This has long been the rule in Ohio.

Since the various lessees had the right to operate the track only during certain meets of the year, only one of the lessees could have had a possessory interest in the track on November 9, 1984. This lessee was Northeast. Grandview's lease permitted it to operate either a summer or fall meet depending on the year. In November, Grandview had no possessory interest in the track and, therefore, had no right to bring a trespass action against Northfield. Northeast, however, in having the right to operate the track during the winter meet, did have a possessory interest in the track and could bring such a claim.

Northeast should have prevailed against Northfield on its claim for trespass only if the record below indicates Northfield acted without authority in retaking possession of the premises. To determine what authority, if any, Northfield had in taking possession of the track, we must look to the lease between the parties.

Section 17 A of the lease between Northeast and Northfield provides:

"A. In the event:

"(1) Lessee shall make default in the payment of rent or of any other term, covenant, provision or condition by Lessee to be kept, observed and performed under and by virtue of the terms of this lease, and such default shall continue for a period of ten (10) days after written notice shall have been given of such default by Lessor to Lessee, or

"(2) Lessee abandons the demised premises, or

"(3) Lessee, or any partner of Lessee, files for voluntary bankruptcy, is adjudicated a bankrupt in involuntary proceedings (not vacated within thirty (30) days), or

"(4) a receiver or trustee is appointed of Lessee's, or any partner of Lessee's, property, or

"(5) Lessee, or any partner of Lessee, assigns his or its estate or effects for the benefit of creditors, or

"(6) any execution, attachment or other order of court shall be issued upon or against the interest of Lessee in this lease and shall continue for a period of thirty (30) days after notice, the Lessor, at any time thereafter, and prior to the curing of default, at its election and without further notice, may avoid and terminate this lease, reenter into possession of the demised premises, with or without process of law, and expel, remove or put out Lessee or any other person or persons occupying said premises, using such forces as may be necessary to do so and to repossess said premises; and sue for and recover all rent earned up to the date of such entry; or the Lessor

may, without terminating this lease, terminate the Lessee's right of possession, re-enter and resume possession of the demised premises, as aforesaid, and relet the same for the remainder of the term, at the best rent Lessor can obtain, for the account of Lessee, who shall make good any deficiency to Lessor upon demand from Lessor; or the Lessor may sue and recover all rents accrued or accruing under this lease without declaring this lease terminated or entering into possession of the demised premises to terminate Lessee's possession. All of the foregoing rights of Lessor shall be without prejudice to any remedies of Lessor under law to recover any other damage suffered by Lessor by reason of any default of Lessee in performance of its duties and obligations under the terms and conditions of this lease."

Under the foregoing section of the lease, Northfield, as lessor, was empowered to enter and take possession of the premises, with or without process of law, if Northeast, as lessee, continued in default of rent or any other provision under the lease, after it received ten days' notice to cure such defaults.

The record below overwhelmingly supports the finding by the trial court that Northeast was in default of numerous provisions in the lease. Section 5 of the lease required Northeast to purchase and pay for all the utility, gas and water consumed on the premises by Northeast. Northeast failed to pay the electric, gas, water, and telephone bills. In fact, on November 9, 1984, the date of re-entry, all utilities except water had been terminated for nonpayment.

Northeast was required to obtain and pay for insurance on the property. When Northfield took possession of the premises, Harris & Company, Harness Horsemen's International, HTA Insurance, and the Ohio Harness Horseman's Association, all were owed unpaid insurance premiums by Northeast for various insurances they provided at the track.

Northeast was required to properly maintain the premises. Evidence below supports the finding by the trial court that the front gate was rusted and bent, the booth for ticket collectors was broken up, the grandstand was in need of painting and repair, ticket machines were cannibalized, windows were cracked and leaking, the carpeting was burnt and worn out, there were no heaters for hot water in the barn or tack room, the parking lot was filled with chuckholes and was in need of major repairs, much of the equipment at the track was in disrepair, the air conditioner was broken, and numerous ceiling tiles were hanging and torn.

The lease also required Northeast to use its best efforts to secure racing dates in each year to be conducted on the leased premises. Ohio Adm. Code 3769-12-09 provides that application for each succeeding year must be applied for by November 1 of the preceeding year. As of November 9, 1984, Northeast had made no application to the Ohio State Racing Commission for any permit to race in 1985.

The lower court properly concluded Northeast was in default of certain of its obligations under the lease. We must now determine whether Northeast was given adequate notice by Northfield to cure its various defaults. The trial court found that "there was adequate notice of default to all the defendants." The record contains the following evidence to support this finding:

On December 10, 1982, Northfield notified Northeast and its four partners that it was in default of its obligations under the lease. This notice was in writing and specifically stated that there were numerous defaults, not the

least of which was $161,000 due from Northeast to Northfield.

On February 20, 1984, Northfield sent additional written notice to Northeast indicating the defaults set forth in the December 10, 1982 letter remained uncured. Northeast was also notified of an additional default on its part to timely pay rent to Northfield.

On March 29, 1984, Northfield again was compelled to notify Northeast it was in continued default of rent. In the March 29 communication, Northeast was requested to correct this deficiency immediately.

On November 9, 1984, the date Milstein took over possession of the property, a letter was sent to Northeast and its general partners setting forth nine enumerated defaults on the part of Northeast that had been taking place over a period of several years.

The record also discloses that Milstein, on behalf of Northfield, repeatedly gave Northeast and its partners notice of these defaults verbally. This apparently was done once or twice per week over an extended period of time.

Despite the numerous written and verbal notices sent to Northeast concerning its repeated failure to perform its obligations under the lease, the defaults were not cured. The track remained in need of repair, the parking lot required resurfacing, the utilities remained unpaid, no applications for racing permits had been made for the 1985 racing seasons, and numerous other bills had not been paid. These breaches of the lease by Northeast were material, not trivial.

Northeast contends, however, that if it had received written notice of these breaches on November 9, 1984, it would have cured them in ten short days. To take this argument to its extreme, Northeast apparently believes it does not have to perform according to the terms of the lease until given written notice to do so.

The purpose of giving written notice to Northeast, as lessee, was to assure it that Northfield was aware of Northeast's deficiencies under the terms of the lease and to give it a reasonable opportunity to cure them. We cannot say, as a matter of law, that the trial court erred in finding Northeast was given adequate notice of default under the terms of the lease, as well as ample time to cure its defaults.

The argument has also been presented that the language of Section 17 A of the lease, as set forth above, required any notice to Northeast to state specifically that if the defaults were not cured within ten days, Northfield would proceed to dispossess Northeast of the premises. Our reading of this provision of the lease does not disclose any such requirement. If it had been the intent of the parties to require a notice which contained that specific language, they could have, and should have, made such requirement appear within the four corners of the lease. This not having been done, we will not now require what Northeast in entering into the lease did not require. The record below amply supports the trial court's finding that adequate notice of default was given to Northeast.

Even though Northfield had authority under the lease to retake possession of the premises, the appellants ask us to find that such "self-help" provisions, absent legal process, are void and unenforceable as being against public policy.

Until recently, the courts of Ohio permitted a landlord to peacefully retake possession of his premises from a defaulting tenant, even in the absence of judicial process. *Smith* v. *Hawkes* (1862), 2 Ohio Dec. Rep. 733 (which reviewed the case law from the various jurisdictions supporting this doctrine); *Hines* v. *Miller* (1934), 32 N.P. (N.S.) 71. Under English law, a landlord could use reasonable force to evict a tenant without resort to legal process.

*State, ex rel. Marsol Apt. Co.*, v. *Vannuci* (1980), 68 Ohio App. 2d 181, 22 O.O. 3d 279, 428 N.E. 2d 468, citing Annotation (1966), 6 A.L.R. 3d 177, 182.

In 1971, Judge Rocker of the Shaker Heights Municipal Court ruled that a landlord seeking to dispossess a residential tenant may not summarily lock the tenant out, but must first bring an action in forcible entry and detainer. *Edwards* v. *C.N. Investment Co.* (1971), 27 Ohio Misc. 57, 56 O.O. 2d 261, 272 N.E. 2d 652.

In 1974, the Ohio Legislature followed Judge Rocker's lead by enacting R.C. 5321.15(A):

"No landlord of residential premises shall initiate any act, including termination of utilities or services, exclusion from the premises, or threat of any unlawful act, against a tenant, or a tenant whose right to possession has terminated, for the purpose of recovering possession of residential premises, other than as provided in Chapters 1923., 5303., and 5321., of the Revised Code."

The legislature has taken no action concerning the use of self-help in the case of tenancies involving other than residential premises. The fact it has considered self-help inappropriate in residential situations, but has enacted no legislation prohibiting such provisions in commercial settings, must weigh against a finding that these provisions are against public policy.

The trial court found that no breach of the peace was committed when Milstein took over possession of the track. Further, the agents or employees of Northeast, who were present when Milstein arrived and expressed his intention to take possession of the premises, readily acquiesced in the transition.

It is undisputed that we are dealing here with a commercial lease between two partnerships, each of which had the benefit of counsel in the preparation and review of the lease. In fact, the record discloses that Snyder, who was a partner of Northeast and who negotiated the terms of the lease on behalf of Northeast, was himself an attorney. There is nothing in the record to indicate Northeast was unaware of this provision of the lease. To the contrary, this provision, like the other provisions of the lease, was undoubtedly reviewed, considered and bargained for by each of the parties.

We cannot say, as a matter of law, that a self-help provision in a commercial lease is against public policy where repossession of the premises takes place without a breach of the peace and with the acquiescence of the lessee or its agent, especially when the parties voluntarily entered into the lease agreement knowing full well the nature and implication of the self-help provision contained therein. The legislature in its wisdom has determined not to enact legislation prohibiting such provisions in commercial leases. We will not now do what the legislature has chosen not to do.

Even if Northfield properly terminated Northeast's own lease to operate the racetrack, Northeast asserts that there was no effective notice of default with respect to any default under the Painesville lease. We disagree.

Painesville had no right to possession of the track and its facilities until the start of its meet in 1985. It certainly had notice of its alleged defaults under its lease with Northfield when it received the second amended complaint in the action below. It did not have just several days to cure these defaults, but several months. This it did not do.

Additionally, Painesville and Grandview, as well, could have filed forcible entry and detainer actions of their own against the plaintiff-appellee when their rights of possession arose in 1985. R.C. 1923.02(A)(6). Again, they chose not to avail themselves of a

remedy they wish us to compel the plaintiff-appellee to follow.

The trial court properly held for the plaintiff on the appellants' counterclaims for trespass. Grandview's first and second assignments of error are overruled, as are Northeast's first, second and seventh.

In its third assignment of error, Northeast contends Northfield waived any right it had under the terms of the lease to re-enter the premises, when Northfield accepted certain past due payments for rent after each alleged breach.

Waiver is an equitable defense. The trial court in ruling on this defense was required to weigh and consider all equitable considerations before it. Absent a showing of an abuse of discretion, the trial court must be affirmed. *Southern Hotel Co.* v. *Miscott, Inc.* (1975), 44 Ohio App. 2d 217, 73 O.O. 2d 235, 337 N.E. 2d 660.

As stated above, the record discloses Northeast was in breach of many of the provisions of the lease, not just the one pertaining to rent. Besides giving numerous written notices to Northeast concerning its repeated defaults, Milstein, on behalf of Northfield, never ceased to notify Northeast verbally of the continued defaults in the provisions of the lease. There is no indication in the record that Northfield ever expressed to Northeast, either verbally or in writing, that it acquiesced in the numerous defaults or otherwise condoned them.

The foregoing facts, coupled with the fact the defaults continued over an extended period of time, support the trial court's rejection of Northeast's allegation of waiver. We cannot say the trial court abused its discretion in so holding. Northeast's third assignment of error is overruled.

The trial court granted judgment against each of the defendants-appellants for unpaid rent upon a machine called the "totalizator." This machine is a computer which places bets, calculates odds and displays information to prospective bettors at the track. Both Grandview and Northeast assign as error the trial court's action in rendering judgment against them in this respect.

This is a weight of the evidence argument. Judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co.* v. *Foley Constr. Co.* (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578.

The essential elements of a cause of action to recover unpaid rent are an agreement to pay rent and the failure to do so. There is a written lease between the parties, wherein Northfield, as lessor, agreed to lease the totalizator system to Grandview and Northeast, as lessees. This was not disputed below. There was testimony below by plaintiff's accountant that $191,677.07 of rent had not been paid under the terms of the totalizator lease, $24,369.50 of which was attributable to Grandview and $167,307.57 being attributable to Northeast. Further, there was evidence below that Northfield declared these rental payments as income on its books, as well as in its tax return to the government.

Grandview and Northeast argue that they do not owe this rent because there was evidence at trial that Northfield had not yet made up these deficiencies to Autotote Limited, the manufacturer of the totalizator, which was still owed money on the original purchase price of the machine. We are not convinced by this argument. Northfield was obligated to Autotote Limited under the terms of a sales agreement for the totalizator. The appellants were liable to Northfield on a separate and distinct lease agreement.

The fact that Northfield may have been deficient on its payment to Autotote under the sales agreement does not relieve the lessees of their obligations under the lease agreement.

There is evidence in the record establishing a duty on the part of Grandview and Northeast to pay rent on the totalizator. There is also competent, credible evidence to support a finding that they failed to make such payments. Grandview's fifth assignment of error, and Northeast's sixth, are overruled.

Several other assignments of error concerning the weight of the evidence below have been raised by the appellants. Northeast contends the record does not support the finding against it by the trial court for unpaid rent, while Grandview argues that it should not have been ordered to pay interest on the judgment at the prime rate.

The rental provision contained in the Northeast lease provided that rental for the track was to be 1.25 percent of the daily "handle," which is the total amount of money wagered each day of racing. A minimum rent was to be calculated as follows:

"The minimum (rent) payable during any year under this Lease shall be not less than the equivalent of the percentage rental on an average handle of Four Hundred Thousand Dollars ($400,000.00) per day for the full number of days allocated to Lessee by the Ohio State Racing Commission."

This averages out to $5,000 per day for all races scheduled, whether or not they are held. In 1984, the average daily handle was $265,000, while in 1983 it was about $311,000. Thus, in each of these years, a deficiency had to be made up each day to bring the rent to the average daily minimum. Further, $5,000 had to be paid when no races were held.

Northeast argues that if the average handle over the year exceeded $400,000, then something less than $5,000 each day would be owed for days not raced, since the lease speaks of a *yearly* average. While we agree with Northeast's analysis in this regard, the facts indicate the daily handle averaged far less than $400,000 during the years in question. The record amply supports the trial court's award. Northeast's fifth assignment of error is overruled.

Grandview's contention that interest was improperly granted is also withourt merit. Under R.C. 1343.03, when moneys become due under a bond, note or other instrument of writing, the party to whom the money is owed is entitled to receive interest at the rate of ten percent per annum, unless a different rate is agreed to by the parties in writing.

While the parties did enter into an express agreement that interest should be paid on moneys owed between the parties, the agreement does not recite the rate at which the interest is to be calculated. Claude Ball, accountant for Northfield, testified he calculated interest at the prime rate of the Marine Midland Bank of Buffalo, New York, because that was the rate of interest Northfield was charged by Sportservice on a certain note and mortgage it held on the racetrack. The trial court arrived at the amount of judgment rendered against Grandview by calculating what was owed by Grandview to Northfield, and giving appropriate credit to Grandview for moneys it was owed by Northfield. Some of the funds due Grandview by Northfield included interest on the principal owed Grandview by Northfield. This interest was also calculated at the above-noted prime rate. If we were to have the trial court calculate interest at the rate of ten percent per annum, there would be a net loss to Grandview. While the amount of interest it owes to Northfield would be

reduced, the amount of interest received by it from Northfield in the offset would be reduced even more.

Since the error of which Grandview complains is beneficial to it, rather than prejudicial, its fourth assignment of error is overruled.

Both appellants ask us to find as error the failure of the trial court to declare that only Northeast and Grandview could conduct their respective meets at the park. The determination of who may obtain racing permits rests with the Ohio State Racing Commission. R.C. Chapter 3769.

R.C. 3769.04 provides that any person may apply for a racing permit. It is unquestioned that Northfield did just that for the 1985 racing season and that the commission granted its application. These permits were admitted into evidence.

R.C. 3769.03 specifically provides, in pertinent part:

"With respect to the issuance, denial, suspension, or revocation of a license to a participant in horse racing, the action of the commission shall be subject to Chapter 119. of the Revised Code."

R.C. 119.12 provides the method and manner with which a party adversely affected by an administrative order may appeal that order. If either of the appellants believed the permits in question were not issued pursuant to law or otherwise should not have been granted to the requesting party, it had an obligation to utilize the administrative appeals process. Since this was not done, their requests for relief must be denied. Grandview's third and Northeast's fourth assignment of error are overruled.

Two of Grandview's remaining assignments of error allege abuse of discretion by the trial court. Assignment of error number six calls into question the court's ruling permitting Northfield to amend its pleadings to conform

to the evidence, while the seventh assignment concerns the court's decision to admit the testimony of Claude Ball, an accountant for Northfield.

The decision to grant or deny a Civ. R. 15(B) motion to amend pleadings to conform to the evidence is within the sound discretion of the trial court. Such discretion will not be disturbed in the absence of "gross abuse" by the trial court. *Spisak* v. *McDole* (1984), 15 Ohio St. 3d 62, 63, 15 OBR 157, 158, 472 N.E. 2d 347, 348, citing *Flynn* v. *Sharon Steel Corp.* (1943), 142 Ohio St. 145, 159, 26 O.O. 343, 348, 50 N.E. 2d 319, 326.

Apparently Grandview's only stated reason for questioning the trial court's decision to allow Northfield to amend its pleadings is that it was not given an adequate opportunity to evaluate the validity of the claims presented or to prepare any defense to the claims. Civ. R. 15(B), however, specifically provides that the court may grant a continuance to an objecting party to enable it to meet the evidence presented. Since Grandview did not request such a continuance, it should not now complain that it was not given an opportunity to develop its case. Grandview's sixth assignment of error is overruled.

Further, it appears that Ball's testimony, and the summaries he presented, fall within an exception to the hearsay rule. Evid. R. 803(6) provides:

"(6) A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule

901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

Ball testified that he was the custodian of the records in question. He further testified that the records were kept in the ordinary course of business, that they were made at or about the time of the events stated on the exhibits, that they were made by someone having knowledge of the figures contained therein, and that it was the regular practice of his business to make such reports. We find nothing in the record which would lead us to conclude, as a matter of law, that these reports lacked trustworthiness. There appearing to be no error on the part of the trial court in admitting these records, we must overrule Grandview's seventh assignment of error.

In its last assignment of error in case No. 50758, Northeast asks us to reverse the trial court's order directing it to convey the liquor permit to Northfield.

Northeast argues that it is under no duty, contractual or otherwise, to transfer the permit to Northfield. Paragraph 20 of the lease between Northeast and Northfield provides:

"All rights in existing contracts, permits and licenses pertaining to the operations at Northfield Park are hereby assigned to Lessee and Lessee hereby assumes all obligations in respect thereto. Such contracts, permits and licenses shall include, without limitation, the following, and any other contracts or agreements of which Lessee or its individual partners are aware:

"Collective Bargaining Agreements

"*Liquor Permits*

"Racing Permits

"Totalizator Service and Maintenance Contract

"Concession Agreements

"Employment Contracts

"Management Contracts

" * * *

"If the lease is terminated, either pursuant to the terms thereof or by failure to exercise the option at the end of the term, all proprietary rights in such contracts, permits and licenses *shall revert to the Lessor.*

"Either party will execute all documents and take all steps that counsel for the respective parties find reasonably necessary to accomplish the conveyance and assumption herein contemplated or the *reversion* of the foregoing to Lessor." (Emphasis added.)

Clearly, Northeast was under a contractual obligation to take the necessary steps to transfer the liquor permit back to Northfield. The trial court did not err in ordering Northeast to do what it had already agreed to do. Northeast's eighth assignment of error is overruled.

In the eighth and last assignment of error by Grandview in case No. 50788, we are asked to find as error the failure of the trial court to award punitive damages. Since the trial court properly found for the plaintiff-appellee on all of Grandview's counterclaims, there existed no basis for an award of punitive damages in favor of Grandview. Grandview's eighth assignment of error is overruled.

We are now called upon to resolve the appeal presented by the appellants in case No. 51383. The sole assignment of error presented in that appeal reads:

"The trial court erred in entering the liquor permit order, when there was no finding of contempt and when the trial court had been divested of jurisdiction to amend or modify the un-

derlying judgment because an appeal had been taken."

The order in question directs the partners of Northeast to execute those documents necessary to transfer the liquor permit from Northeast to Northfield, such transfer having been previously ordered by the court. The order also provides that Northfield is empowered to execute the documents in place of Northeast's partners, if they fail or refuse to do so.

Appellants ask us to consider this order as a modification or clarification of the trial court's prior order directing Northeast to transfer the liquor permit to Northfield pursuant to Civ. R. 60(A). The appellee argues, in contrast, that the order is merely an order issued pursuant to Civ. R. 70, which enforces the court's judgment. Civ. R. 70 provides in pertinent part:

"If a judgment directs a party to execute a conveyance of land, to transfer title or possession of personal property, to deliver deeds or other documents, or to perform any other specific act, and the party fails to comply within the time specified, the court may, where necessary, direct the act to be done at the cost of the disobedient party by some other person appointed by the court, and the act when so done has like effect as if done by the party. * * *"

The court, in its judgment, had ordered Northeast to transfer the liquor permit. This it failed to do. The fact that the court specifically found Northeast was not in contempt of the order does not mean it was not disobeyed, but only that there was insufficient evidence presented to the court to support a finding it was wilfully disobeyed.

The appellants took no action to obtain a stay under the provisions of Civ. R. 62 to stay the enforcement of the judgment rendered against them. Accordingly, it was within the power of the trial court to issue an order to enforce its judgment. Appellants' as-

signment of error in case No. 51383 is overruled.

There being no merit to any of the assignments of error in the three cases before us for review, the judgments of the trial court are affirmed.

*Judgments affirmed.*

STILLMAN, P.J., and VICTOR, J., concur.

HOFSTETTER, J., retired, of the Eleventh Appellate District, STILLMAN, J., retired, of the Eighth Appellate District, and VICTOR, J., retired, of the Ninth Appellate District, were assigned to active duty pursuant to Section 6(C), Article IV, Constitution.