DECISION AND JUDGMENT
{¶ 1} Appellants/cross-appellees, TransPacific Manufacturing, Ltd. ("TPM") and Carey Simon, appeal from an entry of judgment that was entered against them and in favor of appellee/cross-appellant, Executive Business Centres, Inc. ("EBC"). For the reasons that follow, we affirm in part, and reverse in part, the judgment of the trial court.
 {¶ 2} At all relevant times, EBC operated a business that provided "serviced offices," virtual offices, and office services (such as telephone and voice mail systems, *Page 2 
internet access, and receptionist and clerical support). Beginning in 2002, EBC provided such serviced offices to TPM and W.J. International, two businesses that were owned by Simon. The offices were provided pursuant to two written office service agreements. Under the contracts signed in 2003, the combined monthly contract charges amounted to $1,743.
 {¶ 3} In April 2004, EBC and TPM entered into a new written office services agreement, this time for a larger, combined, office space on the EBC premises. On April 26, Simon signed the agreement as a guarantor for TPM, and on April 29, EBC President Beth Yingling executed the agreement on behalf of her company. TPM agreed to a monthly rental fee of $4,070, and the term of the agreement was 36 months.
 {¶ 4} Although the agreement called for TPM to occupy the space on June 1, 2004, the company did not move in on that date, because EBC had not yet completed renovations on the space. At trial, Simon testified that he signed an addendum to the contract which changed the move-in date to "August 1, 2004 or upon substantial Client improvements according to Exhibit A, whichever is earlier."
 {¶ 5} Following the original June 1 move-in date, EBC continued to make improvements on the office space and TPM continued to occupy office space in another part of the building, under the terms of their previous office service agreement.
 {¶ 6} At some point shortly after August 1, 2004, EBC sent a second proposed addendum to TPM, seeking to change the move-in date to October 1, 2004. Simon *Page 3 
refused to sign the proposed addendum. However, on September 23, 2004, TPM spokesman Amos Barcus sent an e-mail to Yingling stating that "we would like to occupy October 1st and begin the lease at that time."
 {¶ 7} EBC completed its work and TPM moved into the office space over the weekend of October 1-4, 2004. Soon after, Simon notified Yingling that the condition of the space was unsatisfactory, due to damaged ceiling tiles, extra carpeting that had not been cleared away, and other assorted debris. As a result of the condition of the space, TPM submitted a rent check for the month of October in the reduced amount of $1,743. TPM based this amount on the monthly rental fee that it had paid for spaces occupied prior to October 1.
 {¶ 8} On October 22, 2004, the parties met in an attempt to resolve the dispute, but reached no agreement. In December 2004, TPM's November rent check (again, in the amount of $1,743) failed to clear, for lack of sufficient funds. On Friday, December 10, 2004, EBC contacted TPM with the intention of terminating the agreement by 5 o'clock that evening unless TPM paid the balance on 13 invoices totaling $17,417.87. In response, TPM submitted a check for $4,732.56 in exchange for extended services until the following Monday. On December 17, 2004, TPM vacated the office space.
 {¶ 9} On December 21, EBC filed a complaint in the Maumee Municipal Court against TPM and Simon for amounts allegedly due and payable under the 2004 agreement. On April 26, 2005, TPM and Simon filed an answer and a counterclaim *Page 4 
seeking damages for a wrongful eviction. EBC moved for summary judgment dismissing the counterclaim, which the Maumee Municipal Court granted on May 10, 2006.
 {¶ 10} The complaint came before the Maumee Municipal Court for a bench trial on August 2, 2006. Instead of proceeding with the trial, the Maumee Municipal Court transferred the matter to the Lucas County Court of Common Pleas, on the basis that EBC's claim — for $13,933.37 in unpaid charges, plus interest at the rate of 18 percent per annum totaling $4,342.53, and attorney fees totaling $22,841.38, which attorney fees were based on the contract between the parties — exceeded the monetary jurisdiction of the Maumee Municipal Court.
 {¶ 11} The case was tried to the common pleas court on March 1 and 2, 2007. The trial court stated in its findings of fact and conclusions of law that TPM had breached the terms of the lease agreement by failing to make all of the payments due for the services and space provided by EBC, and that EBC had been damaged by TPM's actions. After considering the charges claimed by EBC and the monies paid by Simon and TPM, the court determined that EBC was entitled to an award of $5,645.98 for damages. In addition, the trial court awarded EBC attorney fees in the amount of $20,296.38. The court also awarded interest "at the statutory rate," "beginning 30 days after all rights of appeal have passed."
 {¶ 12} TPM and Simon timely appealed the trial court's judgment, raising the following assignments of error: *Page 5 
 {¶ 13} I. "THE TRIAL COURT (LUCAS COUNTY COMMON PLEAS COURT) ERRED BY FINDING THAT APPELLANTS BREACHED THE LEASE CONTRACT."
 {¶ 14} II. "THE TRIAL COURT (LUCAS COUNTY COMMON PLEAS COURT) ERRED BY FINDING THAT APPELLANTS ARE LIABLE FOR DAMAGES OF $5,645.95."
 {¶ 15} III. "THE TRIAL COURT (LUCAS COUNTY COMMON PLEAS COURT) ERRED BY FINDING THAT APPELLANTS ARE LIABLE FOR ATTORNEY FEES OF $20,296.38."
 {¶ 16} IV. "THE TRIAL COURT (MAUMEE MUNICIPAL COURT) ERRED BY GRANTING APPELLEE'S PARTIAL MOTION FOR SUMMARY JUDGMENT ON APPELLANT'S COUNTERCLAIM AND DISMISSING THE COUNTERCLAIM."
 {¶ 17} EBC raised the following cross-assignments of error:
 {¶ 18} I. "THE TRIAL COURT ERRED IN FAILING TO AWARD EBC PRE-JUDGMENT AND POST-JUDGMENT INTEREST AT THE CONTRACT RATE OF EIGHTEEN PERCENT (18%) PER ANNUM."
 {¶ 19} II. "THE TRIAL COURT ERRED IN PROVIDING TPM AND MR. SIMON A DOUBLE CREDIT IN THE AMOUNT OF $4,732.56."
 {¶ 20} III. "THE TRIAL COURT ERRED IN NOT REQUIRING TPM AND MR. SIMON TO PAY THE RETAINAGE [sic] DUE UNDER THE CONTRACT." *Page 6 
 {¶ 21} We note at the outset that an appeals court, in reviewing a trial court's judgment following a bench trial, must apply an abuse of discretion standard, with the guiding presumption that the fact-finder's findings are correct. Parma Park West Apartments, Ltd. v. Guzman, 8th Dist. No. 89262, 2008-Ohio-226, ¶ 17, citing Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 79-80. The trial court does not abuse it's discretion in entering a judgment, where the judgment is supported by some competent, credible evidence going to all the essential elements of the case. Id.
 {¶ 22} TPM and Simon argue in their first assignment of error that the trial court erred in finding that they breached the lease contract. First, they dispute a finding by the trial court that TPM's September 23, 2004 request to move into the new office, together with the company's subsequent move into that space, constituted a waiver of TPM's and Simon's right to rescind the contract. According to TPM and Simon, by the time these acts occurred, the contract had already been rescinded. TPS and Simon additionally contend that EBC was the party that breached the lease agreement, and that the breach occurred when EBC failed to deliver the office space in a condition acceptable to TPM and Simon by June 1, 2004, or at the latest, August 1, 2004.
 {¶ 23} We begin by considering the trial court's finding of a waiver. A waiver is "an intentional relinquishment, either expressly or constructively, of a known right." Russell v. Fourth Nat. Bank (1921),102 Ohio St. 248, 269. "It may be made by express words or by conduct which renders impossible a performance by the other party, or *Page 7 
which seems to dispense with complete performance at a time when the obligor might fully perform." White Co. v. Canton Transp. Co. (1936),131 Ohio St. 190, 198. Specifically, as it relates to a party's conduct, such conduct will speak for itself, and the parties will be estopped from denying that conduct and its immediate logical consequences. SeeFinkbeiner v. Lutz (1975), 44 Ohio App.2d 223, 228. Absent a showing of an abuse of discretion by the trial court, the trial court's decision regarding waiver must be affirmed. See Northfield Park Assoc. v.Northeast Ohio Harness (1987), 36 Ohio App.3d 14, 22.
 {¶ 24} In the instant case, TPM's actions indicated its waiver of any claim that the 2004 agreement had been breached or had been rescinded due to EBC's failure to deliver possession of the new space on either of the agreed dates of June 1 or August 1, 2004. That is, TPM effectively waived its rights under the 2004 agreement — first when Simon signed the addendum changing the move-in date to August 1, 2004, and, again, when Barcus wrote in his September 23, 2004 e-mail to Yingling, "We would like to occupy October 1st and begin the lease at that time if that works also for EBC."
 {¶ 25} Arguing against this conclusion, TPM and Simon point to Simon's refusal to sign EBC's second proposed addendum, which sought to extend the occupancy date to October 1, 2004. Although evidence of Simon's refusal does appear to be at odds with the action taken by Barcus, the actions of Barcus, coupled with evidence of TPM's subsequent move into the space, amply support the trial court's determination. *Page 8 
 {¶ 26} TPM and Simon additionally argue that EBC breached the contract by failing to provide the office space in a physically satisfactory condition and that, even if the contract is enforceable, they were not obligated to pay the full monthly rent under the 2004 agreement for the months of October, November, and December 2004. We disagree.
 {¶ 27} Although TPM complains that the defective conditions on the property — including left over carpet, nicked ceiling tiles, and dirty light fixtures — "materially and substantially hindered TPM's operation of its business", our review of the record reveals that those conditions amounted to only minor departures from the 2004 agreement. Indeed, the record is clear that EBC provided the new, larger space in a condition in which TPM could, and did, fully operate its business. Under the totality of the circumstances, we find that the weight of the evidence demonstrates substantial performance by EBC under the 2004 contract.
 {¶ 28} For all of the foregoing reasons, TPM's and Simon's first assignment of error is found not well-taken.
 {¶ 29} We next consider together TPM's and Simon's second assignment of error and EBC's second and third cross-assignments of error, each of which involves alleged errors in the trial court's calculation of damages.
 {¶ 30} TPM and Simon argue in their second assignment of error that the trial court's award of damages should be reduced by $2,370, based on the fact that TPM *Page 9 
tendered, and EBC accepted without objection, a check in the amount of $1,743, rather than the contractually agreed-upon $4,070, for the November rent. The problem with this argument is that although EBC did accept the check for $1,743, it never received payment on it, because the check failed to clear due to insufficient funds. Under the circumstances, we do not find that the trial court erred in holding TPM and Simon responsible for the entire $4,070 for the month of November under the 2004 contract.
 {¶ 31} Next, TPM and Simon complain that they should not have been held responsible for the entirety of the $4,070 rent for the month of December, because, pursuant to EBC's demand, they had vacated the premises by December 17, 2004. According to TPM and Simon, they should only be required to pay the prorated sum of $2,306.39 ($135/day x 17 days).
 {¶ 32} Again, we are not persuaded by TPM's and Simon's argument. TPM and Simon were asked to leave the EBC premises, because three months into their 36-month contract with EBC, they breached that contract. The trial court, in requiring them to pay the agreed-upon rent for the balance of the month of December, did not err.
 {¶ 33} TPM and Simon additionally argue that the trial court failed to credit them with a $1,178 deposit that they had given to EBC. Our review of the record reveals that such "deposit" was made as a partial payment on the $4,070 retainer that was said to be due and owing under the 2004 agreement. Given the exact nature of this payment, we consider in this analysis — in addition to TPM's and Simon's second assignment of error — EBC's *Page 10 
third assignment of error, wherein it is argued that the trial court erred in not requiring TPM and Simon to pay the retainer due under the contract.
 {¶ 34} Regarding the retainer, the 2004 agreement pertinently provides:
 {¶ 35} "Retainer. A retainer equal to 1 month's Contract Charges of$4,070 (Less $1178.00, which is already on deposit, equals $2892.00 asbalance due) is payable by Client to EBC in three equal monthly installments of $964.00 on June 1, July 1, and August 1, 2004. If Client ceases using contract services before the expiration of its contract or if Client commits an event of default * * *, then EBC may retain the Retainer in partial satisfaction of its damages."
 {¶ 36} The trial court, in calculating the damages, addressed the retainer amount and concluded that it would not require "the additional payment of the three missing retainer payments which totaled $2,892," because "the agreement between the parties provided that this amount would have been used in partial satisfaction of damages suffered by EBC." We gather from the trial court's statement that an award for the unpaid amount of the retainer was declined because the trial court understood the language of the contract to mean that the retainer itself was not a component of damages. Under this interpretation, retainer monies should only be used to offset any damages ultimately found to be due and owing to EBC, and would not be considered a separate element of damages. *Page 11 
 {¶ 37} EBC, on the other hand, interprets the contract language to mean that the retainer was intended to be a separate element of damages. Under EBC's interpretation, the unpaid retainer monies should have been added to the total sum of the damages that were due and owing.
 {¶ 38} "A general rule of contract interpretation is that if language in the contract is ambiguous, the court should construe the language against the drafting party." Central Realty Co. v. Clutter (1980), 62 Ohio St.2d 411, 413, 406 N.E.2d 515. The contract language dealing with the matter of the retainer monies is clearly ambiguous in this case. As such, it must be construed against EBC, which was the drafting party. Accordingly, we agree with the trial court and conclude that the retainer should not be construed as a separate component of damages. Instead, any retainer monies that were paid by TPM and Simon should be credited as offsetting any damages that were suffered by EBC.
 {¶ 39} As a result of our conclusion, EBC's third cross-assignment of error, wherein it is claimed that the trial court erred in not requiring TPM and Simon to pay the retainer due under the contract, is found not well-taken. We additionally find that, because the trial court failed to use the $1,178 in paid retainer monies to offset the damages that it ultimately found were due and owing to EBC, TPM's and Simon's request for a $1,178 reduction in the trial court's award of damages has merit.
 {¶ 40} TPM and Simon next allege that the trial court erred in awarding EBC additional expenses for finance charges totaling $1,568.61. Such charges were evidenced *Page 12 
on EBC's customer open balance sheet, and were identified by invoice numbers FC 130, FC 132, and FC 134. Testimony by Yingling established that the finance charges consisted of both late fees and interest due, for all amounts outstanding up to the date of the charges, and that the charges were calculated using EBC's accounting software.
 {¶ 41} TPM and Simon specifically object to the charges based upon the fact that no invoices were produced to show the original principal amount from which the late fee was derived. They also object to the charges based upon their own speculation as to how, and upon which figures, the charges may have been calculated. Although TPM and Simon are correct in that no invoices or specific calculations were produced, we note that at no time while the contract was in effect was there ever any objection to these charges and how they were derived. And, even now, there is no evidence to suggest that such charges improperly derived. Accordingly, we are not persuaded that EBC's award of damages should be reduced, in any way, by the amount of these charges.
 {¶ 42} Finally, TPM and Simon assert that they are entitled to a credit for overpayment and overcharges for conference room charges. Contrary to their contention, the evidence — in the form of invoices — although not as detailed and clear as it could be, simply does not suggest that TPM was overcharged for conference room usage.
 {¶ 43} For all of the foregoing reasons, TPM and Simon's second assignment of error, wherein they dispute the trial court's finding of damages, is found well-taken in part, and not well-taken in part. *Page 13 
 {¶ 44} Next, we consider EBC's contention, as set forth in its second cross-assignment of error, that the trial court erred in providing TPM and Simon a double credit in the amount of $4,732.56. Both parties acknowledge that such payment was made on December 10, 2004, shortly before the termination of services under the contract. The disagreement arises in connection with the way this payment was applied and credited.
 {¶ 45} The evidence adduced at trial showed that EBC had applied the $4,732.56 payment to charges that accrued from May 31 to September 30, 2004, and that the balance sought by EBC reflected that payment. As a result, the trial court, in its findings of fact and conclusions of law, did not abuse its discretion when it focused its attention on the economic disputes between October 1 and December 17, 2004. An abuse of discretion did occur, however, when the trial court reduced by an additional $4,732.56 the total amount that was found to be due and owing by TPM. Accordingly, EBC's second cross-assignment of error is found well-taken, and the trial court's judgment shall be modified to increase the principal sum of the judgment in the amount of $4,732.56.
 {¶ 46} TPM and Simon argue in their third assignment of error that the trial court erred in finding that they are liable for attorney fees in the amount of $20,296.38. The basis for the award of attorney fees in this case is found in the terms of the 2004 agreement itself. Under the heading "Additional Charges upon Default," the contract relevantly states: *Page 14 
 {¶ 47} "In the event of default, Client will be liable for the following additional charges:
 {¶ 48} "a. Attorneys' fees and expenses incurred by EBC in enforcing any of its Remedies;"
 {¶ 49} Citing K A Cleaning, Inc. v. Materni, 6th Dist. No. L-05-1293, 2006-Ohio-1989, TPM and Simon argue, not unpersuasively, that the attorney fee provision that is set forth in the lease contract is unenforceable as a one-sided penalty.
 {¶ 50} In K A Cleaning, Inc., supra, this court held that the attorney fee provision that was the subject of that case was "clearly unenforceable", because it operated as a penalty against the appellee and encouraged litigation. Id. at ¶ 11. Explaining this holding, the court went on to state:
 {¶ 51} "[B]ecause the attorney's fee provision only requires appellee to pay appellant's attorney fees in case of breach while requiring nothing from appellant in the event of its breach of the contract, the provision obviously works as a penalty, and its one-sided, appellant-favored nature promotes litigation." Id.
 {¶ 52} Arguing that K A Cleaning does not apply, EBC citesNorfolk Southern v. Toledo Edison, 6th Dist. No. L-06-1268,2008-Ohio-1572, another case that was heard by this court. In that case, the court found that because the appellant and appellee "were of equal bargaining positions, were of similar sophistication and had the opportunity to *Page 15 
obtain counsel to review the provision and negotiate its terms," the contract terms permitting the award of attorney fees were enforceable. Id. at ¶ 65.
 {¶ 53} The court in Norfolk Southern distinguished the type of contract involved in K A Cleaning from the one before it as follows:
 {¶ 54} "In Worth, supra at 242-243, 513 N.E.2d 253, the Supreme Court of Ohio explained the theory behind the unenforceability of the type of contract involved in K A Cleaning: `When a stipulation to pay attorney fees is incorporated into an ordinary contract, lease, note or other debt instrument, it is ordinarily included by the creditor or a similar party to whom a debt is owed and is in the sole interest of such party. In the event of a breach or other default on the underlying obligation, the stipulation to pay attorney fees operates as a penalty to the defaulting party and encourages litigation to establish either a breach of the agreement or a default on the obligation. In those circumstances, the promise to pay counsel fees is not arrived at through free and understanding negotiation.' [Citing, Worth v. Aetna Cas. Sur. Co.
(1987), 32 Ohio St.3d 238.] In contrast, the indemnity provision which included the payment of attorney fees that the court approved of inWorth was freely negotiated by sophisticated businessmen and `the indemnitor's alleged wrongful refusal to honor its obligations caused the indemnitee to incur legal expenses in order to vindicate its right to indemnity.' Id. at 242, 513 N.E.2d 253. Following Worth, it has been held that `attorney fee provisions are enforceable in situations where there are equal bargaining positions, the parties are of similar *Page 16 
sophistication, and both parties had the opportunity to obtain counsel to review the provision and negotiate its terms.'" Id. at ¶ 65, citingFirst Capital Corp. v. G J Industries, Inc. (1999),131 Ohio App.3d 106, 113.
 {¶ 55} Turning to the instant case which involves both: (1) a stipulation to pay attorney fees that is incorporated into an ordinary lease, such as in K A Cleaning; and (2) sophisticated parties with essential equal bargaining positions that had the opportunity to obtain counsel to review the provision and negotiate its terms, such as inNorfolk Southern, we find the law as stated in Big Lots Stores, Inc. v.Luv N' Care, Ltd. (Dec. 4, 2008), 6th Cir. No. 07-4296 to be most applicable. In that case, the court, interpreting Ohio law, found that "recovery of attorney fees pursuant to a contractual provision is not permitted unless the parties specifically negotiated the contractual term so providing." Id. In the instant case, there is no evidence or allegation to suggest that TPM or Simon specifically negotiated the boilerplate attorney fee provision that is at issue herein. Accordingly, we conclude that TPM and Simon must prevail on the issue of attorney fees. TPM's and Simon's third assignment of error is, therefore, found well-taken.
 {¶ 56} EBC argues in its first cross-assignment of error that the trial court erred in failing to award EBC prejudgment and postjudgment interest at the rate of 18 percent per annum, as was provided for under the terms of the 2004 contract. Instead, the trial court awarded "post-judgment interest at the statutory rate," without discussing the contractual interest rate provision. *Page 17 
 {¶ 57} Awards of prejudgment and postjudgment interest in a breach of contract action are governed by R.C. 1343.03(A), which pertinently provides:
 {¶ 58} "[W]hen money becomes due and payable upon any bond, bill, note, or other instrument of writing * * * and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of * * * a contract or other transaction, the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract."
 {¶ 59} "For entitlement to a rate different than the statutory rate of interest to be charged, R.C. 1343.03(A) sets forth two requisites: (1) there must be a written contract between the parties, and (2) the contract must provide a rate of interest with respect to money that becomes due and payable." Yager Materials, Inc. v. Marietta Indus. Ent,Inc. (1996), 116 Ohio App.3d 233, 235-236; see also, Citifinancial v.Barrett, 6th Dist. No. L-07-1058, 2008-Ohio-1558, ¶ 8.
 {¶ 60} Here, there is no question that there was a written contract between the parties that provided that "[i]n the event of default, Client will be liable for * * * [i]nterest on unpaid sums at 18% per annum." This is the rate at which interest accrued under the contract and which the trial court should have awarded to appellant. See *Page 18 Citifinancial, supra, at ¶ 9. For the foregoing reasons, EBC's first cross-assignment of error is found well-taken.
 {¶ 61} Lastly, we consider TPM's and Simon's fourth assignment of error, wherein they argue that TPM's counterclaim was erroneously dismissed by the municipal court on summary judgment. According to TPM and Simon, the municipal court's order was rendered "without an analysis of the parties' opposite arguments." Our review of the record clearly belies this contention. First, the record reveals that the municipal court did not decide EBC's motion for summary judgment until after TPM had submitted its brief in opposition. And second, the municipal court expressly stated in its order granting the motion for summary judgment and dismissing the counterclaim that it had considered both EBC's motion and TPM's memorandum in opposition.
 {¶ 62} TPM and Simon next claim that EBC's motion for summary judgment was granted in error, because landlord-tenant law (the law upon which EBC relied in support of its motion) is inapplicable to TPM's and Simon's counterclaim. The counterclaim was based on TPM's and Simon's assertion that EBC had wrongly evicted them from the premises.
 {¶ 63} Upon TPM's default, EBC followed the statutory forcible entry and detainer procedure set forth in R.C. Chapter 1923. In accordance with that procedure, on December 14, 2004, EBC served a notice to vacate the premises pursuant to R.C. 1923.02(A)(5), (6) and 1923.04. *Page 19 
 {¶ 64} Citing paragraph 12 of the 2004 agreement, which expressly states, under the heading entitled "Assignment," that "this agreement is not a lease or a rental agreement," TPM and Simon argue that without a lease or rental agreement, there can be no landlord-tenant relationship between the parties and, thus, EBC, as a result of its own contract language, is estopped from utilizing landlord-tenant law with respect to TPM's and Simon's claim for wrongful eviction. We disagree.
 {¶ 65} R.C. Chapter 1923 applies more broadly than TPM and Simon would have us believe. It applies not only to lease agreements creating a landlord-tenant relationship within, but to "any agreement * * * that establishes * * * the terms, conditions, rules or other provisions concerning the use or occupancy of premises by one of the parties to the agreement * * *." R.C. 1923.01(C)(5). R.C. 1923.02(A)(5) specifically provides that "Proceedings under this chapter may be had * * * [w]hen the defendant is an occupier of lands or tenements, without color of title, and the complainant has the right of possession to them[.]" Thus, the statutory remedy is available to EBC as against TPM and Simon in this case.
 {¶ 66} After EBC served the notice to vacate the premises, TPM simply left the building, without following the statutory process and asserting its defenses in court and without requiring EBC to obtain an order from the court.
 {¶ 67} The law is clear that the mere issuance of a three-day notice to vacate the premises does not constitute constructive eviction, even if the tenant is current with rent *Page 20 
payments, if the tenant voluntarily leaves the premises. Roberts v. GMSMgt. Co. (Nov. 24, 1999), 8th Dist. No. 75419. Thus, if a tenant voluntarily leaves in response to a three-day notice to vacate the premises, he or she cannot recover for a so-called "wrongful eviction." See, Greenberg v. Murphy (C.P. 1904), 4 Ohio C.C. (N.S.) 531;Ferguson v. Buddenberg (1950), 87 Ohio App. 326.
 {¶ 68} In Ferguson, supra, the court considered a case similar to the one at hand, where, after the defendant served a notice upon the plaintiff to vacate the premises, the plaintiff "voluntarily acquiesced" in the request to vacate. There, the court held that "[i]f the plaintiff had any rights in the premises, he voluntarily released and waived such rights by vacating the premises without protest." Id. at 327.
 {¶ 69} A similar result was reached in the factually analogous case ofGreenberg v. Murphy (C.P. 1904), 4 Ohio C.C. (N.S.) 531, where the court held as follows:
 {¶ 70} "Nothing more than this is alleged in the petition; the landlord demanded possession and demanded it in writing; he said he would begin legal proceedings to recover possession if the tenant did not comply with the demand. It is not alleged that he did begin legal proceedings or do anything else showing his intention to evict the tenant. If the tenant was rightfully in possession and entitled to remain, he should have awaited the legal proceedings that were threatened and made his defense thereto, rather than to have complied with the demand, as he did, and then bring his action for alleged damages which perhaps never would have resulted." *Page 21 
 {¶ 71} Based on the foregoing, we conclude that TPM and Simon, by failing to require, and then defend against, an action for eviction, waived any claim for damages arising from EBC's issuance of the notice to vacate the premises.
 {¶ 72} Arguing against this conclusion, TPM and Simon state that they left the premises, but "with protest", thereby distinguishing their situation from those in both Ferguson and Greenberg. The so-called "protest" came in the form of a letter[1] from TPM's counsel, dated December 16, 2004, which stated:
 {¶ 73} "TransPacific continues to believe that EBC breached the Office Service Agreement, including but not limited to failure to deliver the service and space on time, withholding invoices from TransPacific and then suddenly demanding immediate payment including financial charges, and wrongfully terminating the contract with the eviction demand."
 {¶ 74} The letter further informed EBC that TPM would leave the premises "without waiving any defenses or claims against EBC."
 {¶ 75} We do not agree that the December 16, 2004 letter was sufficient to allow TPM and Simon to leave without requiring a court order, while preserving their claim that it they were wrongfully forced out. If TPM and Simon believed that EBC was wrong, they were obliged to await legal proceedings at which they could assert their defenses. If the court agreed with them, they would be permitted to stay and suffer no *Page 22 
damage. If, on the other hand, the court agreed with EBC, TPM and Simon would be ordered to leave the premises, and EBC could not face any claim for wrongful eviction. In short, if TPM and Simon were permitted to leave voluntarily, yet still seek damages, the result would be to rob EBC of the very protection that R.C. Chapter 1923 provides. For all of the foregoing reasons, TPM's and Simon's fourth assignment of error is found not well-taken.
 {¶ 76} The judgment of the Lucas County Court of Common Pleas is affirmed in part and reversed in part. This case is remanded to the trial court for entry of a judgment consistent with this decision. Appellants/cross-appellees and appellees/cross-appellants are ordered to divide the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT AFFIRMED, IN PART AND REVERSED, IN PART. *Page 23 
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Mark L. Pietrykowski, J., William J. Skow, P.J., Thomas J. Osowik, J., CONCUR.
[1] In fact, TPM and Simon rely on three alleged notices of protest. However two of those letters were sent before the three-day notice was served and, therefore, have no bearing on this issue. *Page 1