DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal and cross-appeal from a judgment of the Lucas County Court of Common Pleas in an action regarding damage that occurred to the property and equipment of plaintiff-appellee/cross-appellant (appellee), Norfolk Southern Railway Company, when an electrical line owned by defendant-appellant/cross-appellee (appellant), The Toledo Edison Company, came in contact with Norfolk's rail line. *Page 2 
 {¶ 2} The facts of this case are as follows. Those portions of the factual statement that are within quotation marks are taken from the trial court's findings of fact and conclusions of law. Norfolk is a Virginia corporation operating as an interstate carrier by railroad, with rail lines and facilities located in Lucas, Wood and other counties in Ohio. Toledo Edison provides electrical service to customers throughout northwest Ohio. In 1925, Toledo Edison and the New York Central Railroad Company ("NYRC"), Norfolk's predecessor in interest, entered into a license agreement which allowed Toledo Edison to install electrical lines above New York Central's railroad tracks. "The 1925 license agreement * * * provided a detailed description of the location upon the NYRC's rail lines and right of way, above which Toledo Edison was permitted to install its lines. The 1925 agreement describes the location as `track station 5 773+70, on the Norwalk Division, at Vickers (about three (3) miles east of Toledo) in the County of Wood, and State of Ohio.' In addition, the 1925 agreement references and fully incorporates drawing No. 36695, dated March 26th, 1924, Revised August 4th, 1925. This drawing clearly shows that Toledo Edison's electrical lines are to cross the NYRC's rail line at station 5 773+70 and just west of an intersection of the NYRC's line with the Toledo Terminal Railroad Line. This intersection is typically referred to as a diamond or an interlocking. This particular intersection is commonly referred to as the Vickers Diamond." The Vickers Diamond is near Wales and Drouillard Roads in Wood County.
 {¶ 3} Eventually Consolidated Rail Corporation ("Conrail") became the successor corporation to NYRC and to the 1925 license agreement. Then, in 1992, Conrail entered *Page 3 
into an easement agreement with Toledo Edison (the "1992 Grant of Easement"). "The 1992 Grant of Easement agreement between Toledo Edison and Conrail was intended to supercede the revocable 1925 license agreement and create a permanent and irrevocable easement, but refers to and fully incorporates the location description and construction plans of the 1925 agreement. Contained within Appendix A of the 1992 Grant of Easement agreement is a specific railroad mile post reference (M.P. 285.38) which further identifies the location of the easement."
 {¶ 4} "The precise location of the easement was clearly known and acknowledged by the parties. The easement can also be readily located by anyone familiar with surveying, including defendant's own surveyor witness, Mr. Silva. The electrical lines have been in the same location for over 75 years and are still present and in use today."
 {¶ 5} As a result of various mergers and acquisitions in the railroad industry, plaintiff-appellee, Norfolk, became the successor grantor of the easement at issue in this case. "As stipulated by the parties, all rights, benefits, obligations, and/or duties that were to inure to the benefit or detriment of Conrail pursuant to the 1925 license agreement have been legally and fully transferred to and assumed by plaintiff Norfolk Southern. In addition, as stipulated by the parties, all rights, benefits, obligations, and/or duties that were to inure to the benefit or detriment of Conrail pursuant to the 1992 Grant of Easement agreement have been legally and fully transferred to and assumed by plaintiff Norfolk Southern." *Page 4 
 {¶ 6} "On December 16, 1999, through no fault of plaintiff Norfolk Southern, a Toledo Edison unenergized static line fell from its support tower just west of the Vickers Diamond in the same location identified in the 1925 agreement as the location where Toledo Edison was permitted to run its electrical lines above the track of the NYRC. This unenergized line became energized with 69,000 volts of electricity and came into contact with [Norfolk's] rail line resulting in extensive damage to its signal system and related structures, switch machines, appliances, and appurtenances which control the movement of trains through the diamond."
 {¶ 7} Norfolk immediately set about to repair the damage, at first making temporary repairs that would allow trains to again move through the diamond, and later making permanent repairs after ascertaining the full extent of the damage.
 {¶ 8} Subsequently, on June 4, 2000, July 27, 2000, March 2, 2002, and July 12, 2002, power surges allegedly related to Toledo Edison's facilities and equipment allegedly caused damage to Norfolk's rail line at other locations in the northwest Ohio area.
 {¶ 9} On October 20, 2004, Norfolk filed a complaint in the court below with regard to all five incidents.[1] Norfolk asserted claims for negligence, breach of contract, unjust enrichment and express assumpsit. In an opinion and judgment entry dated January 11, 2006, the lower court granted Toledo Edison summary judgment on all of *Page 5 
Norfolk's claims against it except for its claim for breach of contract based on the 1992 Grant of Easement agreement as it related to the December 16, 1999 incident. The case then proceeded to a trial to the bench on that claim alone.
 {¶ 10} On July 27, 2006, the lower court issued findings of fact, conclusions of law and a judgment entry in favor of Norfolk and granted it a judgment in the amount of $71,240.71, plus prejudgment interest, attorney fees, and other costs of the litigation. Specifically, and relevant to the issues on appeal, the court concluded that the 1992 Grant of Easement, which incorporated the location description and construction plans of the 1925 license agreement, met the requirements of the statute of frauds and was not void for lack of a proper description of the property conveyed. The court further determined that even if the 1992 Grant of Easement was defective, any defect in the easement document would not prohibit the enforcement of the contract between the parties when the location of the easement was clearly known by both parties, was in use by Toledo Edison for over 75 years, and where Toledo Edison continued to use the easement. In addition, the court determined that if the 1992 Grant of Easement was defective for lack of a proper description, the 1992 Grant of Easement coupled with the 1925 license agreement created a license coupled with an interest in land, making its provisions enforceable. Next, the court found as a matter of law that, within the 1992 Grant of Easement, Toledo Edison agreed to hold Norfolk harmless from any and all damages, costs, and/or expenses whether caused directly or indirectly by its lines coming into contact with Norfolk's property, as occurred on December 16, 1999. In awarding Norfolk *Page 6 
damages, the lower court took into account the depreciated value of the items upon which Norfolk had taken depreciation. Accordingly, the court reduced the damage award by $8,387.49 and awarded Norfolk total damages in the amount of $71,240.71.
 {¶ 11} In a separate judgment entry of July 27, 2006, which contained further findings of fact and conclusions of law, the lower court awarded Norfolk prejudgment interest, costs and attorney fees. The award was based on evidence submitted by the parties at a hearing on July 10, 2006. Specifically, the court awarded Norfolk expenses of $2,434.23, prejudgment interest of $19,569.11, and attorney fees of $52,463.
 {¶ 12} Toledo Edison and Norfolk have filed an appeal and cross-appeal respectively from the two July 27, 2006 judgment entries. Toledo Edison challenges the judgments through the following assignments of error:
 {¶ 13} "1. The trial court's decision to award damages and admit evidence of Norfolk Southern Railway Company's damages that had been presented only two days before trial and not timely supplemented under Ohio Rule of Civil Procedure 26(E) was error and abuse of discretion due to unfair surprise and prejudice.
 {¶ 14} "2. The trial court's decision to award attorneys' fees to Norfolk Southern Railway Company in the amount of $52,463.00 was against the manifest weight of the evidence and an abuse of discretion because attorneys' fees are not recoverable under the 1992 Grant of Easement.
 {¶ 15} "3. The trial court's decision to award attorneys' fees to Norfolk Southern Railway Company was in error and an abuse of discretion because the attorney fee *Page 7 
provision in the contract is an unenforceable penalty against only one party in case of breach.
 {¶ 16} "4. The trial court's decision to award attorney's fees of $52,463.00 to Norfolk Southern Railway Company is excessive, against the manifest weight of the evidence and an abuse of discretion where a portion of the fees were awarded for a previously dismissed cause of action and upon claims on which the plaintiff did not prevail.
 {¶ 17} "5. The trial court's award of prejudgment interest was against the manifest weight of the evidence and an abuse of discretion where interest was calculated before the contractual right of payment accrued and before the invoices were presented to Toledo Edison.
 {¶ 18} "6. The trial court's judgment in favor of Norfolk Southern Railway Company was against the manifest weight of the evidence and an abuse of discretion because the 1992 Grant of Easement does not sufficiently describe the location of the easement to comply with the Statute of Frauds.
 {¶ 19} "7. The trial court's judgment in favor of Norfolk Southern Railway Company was against the manifest weight of the evidence and an abuse of discretion because, absent a description of the property, a defective conveyance of an interest in land prohibits the enforcement of the contract between the parties.
 {¶ 20} "8. The trial court erred because even if the 1992 Grant of Easement between Toledo Edison Company and Consolidated Rail Corporation created a license *Page 8 
coupled with an interest, it remains unenforceable for failure to comply with the Statute of Frauds."[2]
 {¶ 21} Norfolk challenges the trial court's damages calculation through its single assignment of error:
 {¶ 22} "The trial court's calculation of damages was contrary to law, as the appropriate measure of damage [sic] under this contract claim is the cost and expense incurred by Norfolk Southern, not the depreciated value of the damaged property."
 {¶ 23} We will first address Toledo Edison's sixth, seventh and eighth assignments of error together as, combined, they all challenge the trial court's determination that the 1992 Grant of Easement was valid, met the requirements of the Statute of Frauds, and accurately described the property interest conveyed.
 {¶ 24} Toledo Edison contends that the 1992 Grant of Easement was unenforceable because it failed to sufficiently describe the location of the easement and, therefore, failed to comply with the Statute of Frauds. As such, Toledo Edison asserts it cannot be bound by the indemnification provisions of the agreement.
 {¶ 25} In Ohio, the Statute of Frauds is codified in Chapter 1335 of the Ohio Revised Code. In relevant part, R.C. 1335.05 provides that "[n]o action shall be brought whereby to charge * * * a person * * * upon a contract or sale of lands * * * or interest in or concerning them * * * unless the agreement upon which such action is brought, or *Page 9 
some memorandum or note thereof, is in writing and signed by the party to be charged therewith * * *." An easement is an interest in the land of another, created by prescription or express or implied grant, that entitles the owner of the easement, the dominant estate, to a limited use of the land in which the interest exists, the servient estate. SeeAlban v. R. K. Co. (1968), 15 Ohio St.2d 229, 231-232. The "memorandum" referred to in the Statute of Frauds is "`a memorandum of the agreement between the parties, and it is not sufficient unless it contains the essential terms of the agreement, expressed with such clearness and certainty that they may be understood from the memorandum itself, orsome other writing to which it refers, without the necessity of resorting to parol proof." Schmidt v. Weston (1948), 150 Ohio St. 293,296, quoting Kling v. Bordner (1901), 65 Ohio St. 86. (Emphasis added.) In addition, the memorandum must contain a description of the property, although not "with the particularity used in a deed or a formal contract." Sanders v. McNutt (1947), 147 Ohio St. 408, 410. Rather, to comply with the Statute of Frauds, the memorandum "must definitely point out the particular land to be conveyed or must furnish the means of identifying it with certainty." Schmidt, supra at paragraph three of the syllabus.
 {¶ 26} The 1992 Grant of Easement reads in relevant part as follows:
 {¶ 27} "WHEREAS, Grantor [Consolidated Rail Corporation], or its predecessors, have entered into separate license agreements set forth in Appendix A attached hereto and made a part hereof, with Grantee [Toledo Edison Company] or its predecessors to permit the construction, installation, maintenance, and use of certain crossings and *Page 10 
occupations over, across, along, or under the land and tracks of the railroad lines of Grantor at various locations in the County of Wood, State of Ohio (`Agreement' or `Agreements'); and
 {¶ 28} "WHEREAS, the Agreements generally provide for annual payments; and
 {¶ 29} "WHEREAS, the parties hereto desire to replace the Agreements with one permanent and irrevocable easement document as hereinafter set forth for such crossings and occupations.
 {¶ 30} "NOW, THEREFORE, Grantor, for and in consideration of One Dollar ($1.00) and other good and valuable considerations, the receipt of which is hereby acknowledged, and in further consideration of Grantee keeping and performing the covenants and conditions hereinafter stated on the part of Grantee to be kept and performed, does hereby grant unto Grantee, to the extent the title of Grantor so permits, an easement only for the actual physical space and dimensions required for the current physical facilities now existing pursuant to the Agreements, and the right to maintain, repair, alter, renew, relocate, replace, use and remove said facilities. Said facilities, together with any appurtenances thereto are hereinafter referred to singularly as the `FACILITY' and collectively as the `FACILITIES'.
 {¶ 31} "* * *
 {¶ 32} "1.1 The location and construction plans referred to in the Agreements shall continue to apply to the FACILITIES, and no change shall be made thereto, including, but not limited to, change in location, nature, size, number, or use of any *Page 11 
FACILITY without the prior written consent of the Chief Engineer of Grantor or his designee * * * which consent shall not be unreasonably withheld."
 {¶ 33} Attached to the 1992 Grant of Easement was a document titled "Appendix `A' — Wood County, Ohio," which lists the "Agreements" referred to in the text of the contract and expressly made a part thereof. Appendix A is a list of 18 specific license agreements that were replaced by the 1992 Grant of Easement. As is clear from the language of the 1992 Grant of Easement, the newly granted easements covered the actual physical space and dimensions previously covered by the license agreements. Appendix A referenced the 1925 licensing agreement by listing several identifying numbers, including its "Registry" number, 037653-2, the date of the agreement, October 7, 1925, and the mile post numbers between which the license ran. The 1925 licensing agreement, to which Toledo Edison was a party, further and more specifically identifies the area in which the license, now easement, runs. That document reads in relevant part as follows:
 {¶ 34} "Witnesseth, that First Party [New York Central Railroad Company], for and in consideration of the sum of Ten dollars to it paid by Second Party [Toledo Edison Company], together with the rental as hereinafter specified, hereby licenses and permits, but without warranty, the Second Party * * * to construct, maintain and use an electrical wire line * * * upon the right of way and over the tracks of the First Party, at track station 5 773+70, on the Norwalk Division, at Vickers, (about three (3) miles east of Toledo) in the County of Wood, and State of Ohio * * *. *Page 12 
 {¶ 35} "Said electric wire line shall be located between the points indicated by the letters AB CE on print No. 36695, dated March 26th, 1924, Revised August 4th, 1925, hereto attached and made a part hereof, and will be maintained at a minimum height of forty-eight (48) feet above the top of the rails of First party's tracks."
 {¶ 36} As indicated in the text of the 1925 licensing agreement, print No. 36695 is attached to that document and made a part thereof. That print clearly shows the location of area covered by the license, now easement, that is at issue in this case.
 {¶ 37} As stated above, a document granting an easement must definitely point out the particular land conveyed or must furnish the means of identifying it with certainty. Although the 1992 Grant of Easement does not definitely point out the particular land covered by the easement, it does furnish the means of identifying it with certainty. Appellant's witness, Jose Silva, a registered land surveyor, initially testified that nothing in the 1992 Grant of Easement would allow a land surveyor to determine where the easement was located. Upon cross-examination, however, Silva admitted that in doing the survey requested by appellant, he did not ask to see the agreements referenced in Appendix A and did not ask to see the location and construction plans referred to in the 1992 Grant of Easement and expressly made part of that agreement. Moreover, when shown print No. 36695 attached to and made a part of the 1925 agreement, Silva was able to find the location of the electrical lines between the AB and CE points on that print. He further was able to identify that the electrical lines ran over the NYCR lines between the points A and B on the print. He also admitted that he would be able to identify the *Page 13 
location of the easement through the use of the railroad mile posts. Appendix A clearly notes that the 1925 license agreement applies to the railroad's 285.38 mile post, but Silva admitted he never called the railroad or tried to determine the location of mile post 285.38.
 {¶ 38} Appellant challenges the trial court's judgment that the 1992 Grant of Easement complied with the Statute of Frauds, as being against the manifest weight of the evidence. In the civil context, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C E. Morris Co.v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus. Upon a review of the 1992 Grant of Easement and 1925 license agreement and other evidence submitted at the record below, it is clear that the 1992 Grant of Easement complied with the Statute of Frauds and was a valid contract for a conveyance of an interest in land. Accordingly, the sixth and seventh assignments of error are not well-taken.
 {¶ 39} Finding that the 1992 Grant of Easement was valid, we need not address appellant's eighth assignment of error, which challenges the trial court's alternate finding that even if the 1992 Grant of Easement was not an appropriate deed of easement, the 1992 Grant of Easement coupled with the 1925 license agreement created a license coupled with an interest in land, making the contract provisions enforceable. The eighth assignment of error is therefore not well-taken. *Page 14 
 {¶ 40} We will now address appellant's first assignment of error and appellee's sole assignment of error together as they both challenge aspects of the lower court's damages award. Specifically, appellant contests the lower court's award of $27,811.76 in labor and material charges and appellee contests the court's decision only to award the depreciated value of its damaged property.
 {¶ 41} First, we must look to the specific language of the 1992 Grant of Easement regarding damages. Paragraph 6.2 of that agreement reads as follows;
 {¶ 42} "Grantee shall indemnify, save harmless and defend (at Grantor's option) Grantor from and against all cost and expense arising from, or in connection with, any and all losses, damages, detriments, suits, claims, demands, costs and charges which Grantor may directly or indirectly suffer, sustain, or be subjected to by reason of the construction, placement, attachment, presence, use, maintenance, repair, alteration, renewal, relocation, replacement, or removal of the FACILITIES, in, on, about, under, over, or from the property of Grantor, whether such loss and damage be suffered or sustained by Grantor or by its patrons, or licensees, or other persons or entities, including Grantee, its patrons and licensees and whether attributable to the act, omission or neglect of Grantor or any other person or entity, except when proved to be due solely to the negligence of Grantor."
 {¶ 43} Based on this paragraph of the 1992 Grant of Easement, the lower court awarded appellee damages totaling $71,240.71, which the court determined appellee had incurred as a result of the December 16, 1999 incident. This amount included $27,811.76 *Page 15 
for labor and material charges that appellee first revealed several days before trial. Up to that time, appellee had asserted that its damages for the December 16, 1999 incident totaled $43,528.83. However, in its trial brief, filed one week before trial, appellee did state that the company's costs related to the incident were much higher than the invoices that were submitted to Toledo Edison, that the invoices did not include the cost of the insulated joint rails, and that at the trial appellee would present evidence of the additional costs that were not included on the invoices submitted to Toledo Edison. Then, appellant contends, on the morning of Saturday, February 11, 2006, two days before the trial was scheduled to begin, appellee delivered a packet of trial exhibits which contained appellee's exhibits 20(A), (B) and (C), which included the additional charges of $27,811.76. Appellant claims that this was the first time it had been made aware of these charges.
 {¶ 44} At the trial below, appellant objected to the admission of evidence relating to the charges for the insulated joint rails and specifically to exhibits 20(A), (B) and (C). The objection was overruled and appellant then proffered for the record a statement covering the discovery history in the case. Appellant noted that nowhere in its response to the first or second set of interrogatories did appellee include the charges for the insulated joint rails. Appellant further stated that in his deposition of October 12, 2005, Michael Martin, an assistant manager in the billing department of Norfolk, never included the charges associated with the insulated joint rails, despite being asked to explain all charges for the December 16, 1999 incident. Finally, appellant asserted that *Page 16 
appellee never supplemented its discovery responses with exhibits 20(A), (B) and (C) and that appellant first learned of these charges only two days before trial, when appellee delivered to appellant's counsel its packet of trial exhibits.
 {¶ 45} Appellant contends that the trial court erred and abused its discretion in allowing exhibits 20(A), (B) and (C) to be admitted into evidence at trial and in including $27,811.76 in its damages award, which amount was based on this evidence. Appellant asserts that because the admission of this evidence amounted to unfair surprise, the court should have excluded it for appellee's failure to comply with Civ.R. 26(E)(2).
 {¶ 46} Civ.R. 26(E) addresses the issue of supplementation of discovery responses and reads in relevant part:
 {¶ 47} "A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
 {¶ 48} "* * *
 {¶ 49} "(2) A party who knows or later learns that his response is incorrect is under a duty seasonably to correct the response."
 {¶ 50} In the trial court's findings of fact and conclusions of law upholding and enforcing the indemnity provision of the 1992 Grant of Easement, the court also addressed the issue of appellant's request to exclude evidence relating to the material cost of the insulated rail joints and the labor costs in connection with the corresponding thermit welds. After first noting that the issue was a matter left to the court's discretion, *Page 17 
the court stated that if appellant was so steadfast in its position that it had suffered unfair surprise, it could have motioned to continue the trial to conduct further discovery on the matter. The court then determined that there was no evidence before it that appellant was in any way materially damaged by the inclusion of the evidence at issue and that, during the trial, appellant failed to present any evidence attacking any of the damage evidence presented by appellee. The court then held that, because the exclusion of evidence was an extreme discovery sanction and because appellant had failed to meet its burden of showing why such an extreme sanction was necessary, the evidence at issue was properly admissible to prove appellee's damages.
 {¶ 51} It is well-settled that a trial court has broad discretion when imposing, or choosing not to impose, sanctions for discovery violations, and a reviewing court will only review these rulings for an abuse of discretion. Nakoff v. Fairview Gen. Hosp. (1996), 75 Ohio St.3d 254, syllabus. To demonstrate an abuse of discretion, "the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise or reason but instead passion or bias." Id. at 256, citing State v. Jenkins (1984),15 Ohio St.3d 164.
 {¶ 52} A review of the record reveals that at the very least, appellant was on notice that appellee had incurred additional expenses in repairing the damage caused by the fallen static line that were not included in the invoices submitted to appellant. On July 26, 2005, appellant's counsel took the deposition of Lloyd Brewer, a track supervisor for *Page 18 
Norfolk. Brewer was in the area of the Vickers Diamond when the line fell on the track and witnessed the incident. He was also very involved in repairing the damage. In his deposition, Brewer testified that at least 18 locations required joint replacements and each location required two bonded joints. He further testified that the bonded joints cost $800 a piece. When shown the invoice covering the repairs that appellee sent to appellant, Brewer testified that it did not include the joint repairs because he did not have the required number of joints on hand at the time of the incident and that many of them had to be ordered.
 {¶ 53} Similarly, on August 23, 2005, appellant's counsel took the deposition of Daniel Niemiec, Jr., a supervisor for Norfolk who oversaw maintenance and testing of equipment in the Toledo area. Niemiec testified that although he was not privy to the total amount that Norfolk actually billed appellant for the damages, he was certain that the damages were considerably more than what was reflected in the bills.
 {¶ 54} Under these circumstances, we cannot say that the lower court abused its discretion in allowing exhibits 20(A), (B) and (C) to be admitted into evidence at trial and in including $27,811.76 in its damages award. Appellant was on notice that appellee had incurred damages in excess of those that it had billed and so we fail to see how it was unduly surprised by the inclusion of the evidence regarding the bonded joints. Appellant's first assignment of error is not well-taken.
 {¶ 55} In its sole assignment of error, appellee contends that the lower court erred in awarding it the depreciated value of its damaged property. Rather, appellee asserts, the *Page 19 
proper measure of damages was that set forth in the 1992 Grant of Easement: "all cost and expense arising from, or in connection with, any and all losses, damages, detriments, suits, claims, demands, costs and charges which [Norfolk] may directly or indirectly suffer, sustain, or be subjected to by reason of the construction, placement, attachment, presence, use, maintenance, repair, alteration, renewal, relocation, replacement, or removal of the FACILITIES, in, on, about, under, over, or from the property of Grantor *
 {¶ 56} Where the amount of damages is challenged, an appellate court will not disturb the trial court's award absent an abuse of discretion.Roberts v. United States Fid. Guar. Co. (1996), 75 Ohio St.3d 630,634. It is well-settled that the purpose of an award of damages is to make the injured party whole. Columbus Southern Ohio Elec. Co. v. J.P.Sand Gravel Co. (1985), 22 Ohio App.3d 98, 100, citing ColumbusFinance v. Howard (1975), 42 Ohio St.2d 178, 184. When evaluating a claim for property damage, the proper measure of damages is generally the reasonable costs necessary to restore the property to its pre-damage condition. Adcock v. Rollins Protective Services Co. (1981),1 Ohio App.3d 160; Florea v. Nationwide Mut. Fire Ins. Co. (Jan. 28, 1983), 2d Dist. No. 7908. Such an award must also take into consideration depreciation amounts "since bare replacement costs would indisputably result in an inflated award of damages." Florea, supra.
 {¶ 57} At the trial below, appellee presented evidence in support of its claim for $79,628.20. The trial court accepted this amount and then reduced the award by *Page 20 
$8,387.49, the amount of depreciation that would be applicable to the new wire, cable and insulated joints used to repair the damage. Michael Martin, the supervisor of miscellaneous billing for Norfolk, testified that when Norfolk makes repairs to equipment, the materials used are billed as expenses, not capital expenditures, and therefore are not subject to depreciation. He further testified, however, that the only capital asset subject to depreciation would be the cable and that in 1980, the cable was replaced, considered a capital improvement and had been subject to a 20 year depreciation schedule. Previously, Lloyd Brewer had testified that the entire interlocking system in the Vickers Diamond had been completely replaced in 1978 and that since then, the insulated joints were replaced every two years. With regard to the cable, wire and insulated joints, Martin did calculate depreciation for those items that totaled $8,387.49.
 {¶ 58} Upon review, we cannot say that the trial court abused its discretion in including depreciation in its calculation of appellee's damages. The cable was clearly subject to depreciation, and the damaged cable was at the end of its depreciable life. As to the wire and insulated joints, appellee would be unjustly enriched by an award of what truly is a capital asset without some offset for depreciation. We further conclude that the inclusion of depreciation in the calculation of damages was not contrary to the indemnification provision of the 1992 Grant of Easement. Appellee was entitled to be compensated for all of its costs and expenses arising from the placement of appellant's facilities over the property of appellee, not more than its costs and expenses. Appellee's *Page 21 
initial outlay for the repair and replacement of the cable, wire and insulated joints was not the true cost of those repairs. Rather, the true costs and expenses must take into consideration depreciation. Appellee's sole assignment of error is not well-taken.
 {¶ 59} We will now address appellant's second, third and fourth assignments of error, which challenge the trial court's award of attorney fees. Appellant contends that the trial court's award to appellee of attorney fees was in error because the 1992 Grant of Easement does not include a provision for the award of attorney fees under the circumstances of this case and that if the agreement does contain such a provision, the provision is unenforceable. Finally, appellant contends that the trial court's award of $52,463 was excessive, against the manifest weight of the evidence and an abuse of discretion.
 {¶ 60} It is well-established that a "trial court's determination to grant or deny a request for [attorney] fees will not be disturbed, absent an abuse of discretion." Motorists Mut. Ins. Co. v.Brandenburg (1995), 72 Ohio St.3d 157, 160. Where the appellate court is able to determine the rationale underlying the fee award and the record supports the same, no abuse of discretion will be found. Rendina v.Rendina, 11th Dist. No. 2003-L-193, 2005-Ohio-4772, ¶ 70, citingHansen v. Hansen (Dec. 11, 1992), 11th Dist. No. 92-L-052. "Generally, a prevailing party may not recover attorney fees from the unsuccessful party. See, e.g., Nottingdale Homeowners' Assn. v. Darby (1987),33 Ohio St.3d 32 * * *; Worth v. Aetna Cas. Sur. Co. (1987), 32 Ohio St.3d 238
* * *. The parties to a contract may, however, enter into an agreement that provides for the recovery *Page 22 
of attorney fees in the event of a dispute requiring legal intervention.Nottingdale; see, also, Fleischmann Distilling Corp. v. Maier BrewingCo. (1967), 386 U.S. 714, 717[.]" Motorist Ins. Cos. v. Shields (Jan. 29, 2001), 4th Dist. No. 00CA26, 2001-Ohio-2387.
 {¶ 61} In the proceedings below, the trial court awarded appellee attorney fees pursuant to the 1992 Grant of Easement. Paragraph 6.3 of that agreement reads in relevant part: "Notwithstanding anything contained in Section 6.2, and irrespective of any negligence of Grantor [Norfolk], Grantee [Toledo Edison] assumes sole responsibility for, shall indemnify, save harmless, and defend (at Grantor's option) Grantor from and against all claims, actions, or legal proceedings arising in whole or in part, from (i) the failure of Grantee to comply with any obligations imposed on it by this Easement agreement * * *." The obligations under the easement agreement, with which the trial court determined appellant failed to comply, were those set forth in paragraph 6.2. That is, the trial court expressly found as a matter of law that Toledo Edison agreed to hold Norfolk harmless from any and all damages, costs and/or expenses, whether caused directly or indirectly by their lines coming into contact with Norfolk's property. In awarding appellee attorney fees, the court determined that the indemnification provisions of the agreement encompassed attorney fees. This finding is not without precedent. In Auber v. Marc Glassman, Inc., 8th Dist. No. 80283, 2002-Ohio-2749, ¶ 25, the court determined that the words "any other expenses" in an indemnity provision of a contract that did not expressly cover attorney fees "should be given their plain meaning and must *Page 23 
therefore include all expenses arising out of the incident including attorney fees and other associated expenses."
 {¶ 62} In the present case, paragraph 6.2 of the 1992 Grant of Easement provided that Toledo Edison shall indemnify Norfolk "from and against all cost and expense arising from, or in connection with, any and all losses, damages, detriments, suits, claims, demands, costs and charges which [Norfolk] may directly or indirectly suffer, sustain, or be subjected to" by reason of the placement of Toledo Edison's lines over Norfolk's right of way "whether such loss and damage be suffered orsustained by [Norfolk] or by its patrons, or licensees * * *." (Emphasis added.) Accordingly, the trial court had a contractual basis for awarding appellee attorney fees and the second assignment of error is not well-taken.
 {¶ 63} Appellant further contends that if the agreement is construed to permit an award of attorney fees, it is void because it operates as a penalty against only one party. In support of this argument, appellant cites a recent case from this court, K A Cleaning, Inc. v.Materni, 6th Dist. No. L-05-1293, 2006-Ohio-1989. That case involved a former employee's violation of a nonsolicitation provision of an employment contract that she had entered into with a cleaning company. The contract included a non-compete clause and a non-solicitation clause and provided that if the employee violated the agreement, she would be liable for attorney fees for appellant's lawsuit to enforce the agreement. When the cleaning company brought suit against the former employee for her breach of the agreement, the trial court refused to award it attorney fees. On appeal, we held that *Page 24 
the attorney fee provision of the contract was unenforceable because it operated as a penalty against appellee, only requiring appellee to pay appellant's attorney fees in the case of her breach while requiring nothing from appellant in the event of its breach of the contract.
 {¶ 64} In Worth, supra at 242-243, the Supreme Court of Ohio explained the theory behind the unenforceability of the type of contract involved in K A Cleaning: "When a stipulation to pay attorney fees is incorporated into an ordinary contract, lease, note or other debt instrument, it is ordinarily included by the creditor or a similar party to whom a debt is owed and is in the sole interest of such party. In the event of a breach or other default on the underlying obligation, the stipulation to pay attorney fees operates as a penalty to the defaulting party and encourages litigation to establish either a breach of the agreement or a default on the obligation. In those circumstances, the promise to pay counsel fees is not arrived at through free and understanding negotiation." In contrast, the indemnity provision which included the payment of attorney fees that the court approved of inWorth was freely negotiated by sophisticated businessmen and "the indemnitor's alleged wrongful refusal to honor its obligations caused the indemnitee to incur legal expenses in order to vindicate its right to indemnity." Id. at 242. Following Worth, it has been held that "attorney fee provisions are enforceable in situations where there are equal bargaining positions, the parties are of similar sophistication, and both parties had the opportunity to obtain counsel to review the provision and negotiate its terms." First Capital Corp. v. G JIndustries, Inc. (1999), 131 Ohio App.3d 106, 113. *Page 25 
 {¶ 65} Upon review of the record in this case, it is clear that in entering into the 1992 Grant of Easement, Norfolk and Toledo Edison were of equal bargaining positions, were of similar sophistication and had the opportunity to obtain counsel to review the provision and negotiate its terms. We therefore cannot say that the indemnity provision covering attorney fees operated as a penalty and the lower court did not err in enforcing its provisions. The third assignment of error is not well-taken.
 {¶ 66} In its fourth assignment of error, appellant challenges the lower court's calculation of attorney fees. Appellant contends that the amount awarded, $52,463, was excessive because it included fees for preparation of claims upon which Norfolk did not prevail. In the proceedings below, the trial court held a hearing on the issues of attorney fees, expenses and prejudgment interest after the trial on appellee's breach of contract claim. At that hearing, the parties stipulated to five items with regard to fees and expenses. Relevant to this assignment of error, the parties stipulated that "plaintiff has two claimed categories, one for damages resulting from a static line drop occurring on December 16, 1999, and a second category consisting of four separate power surge incidents." The power surge claims had all been dismissed prior to trial. The parties then attached Exhibit A to the stipulation, which were the invoices for legal services and related expenses incurred by Norfolk in the prosecution of all of the claims that it had filed against appellant in the present case. That exhibit revealed that the attorney fees incurred by Norfolk up until the end of June 2006 totaled $75,242.72. At the hearing, Norfolk's counsel then stated that he had reviewed the fee statements and eliminated *Page 26 
those fees clearly related to the power surge claims. He then separated out the remaining fees into two categories, those related exclusively to the drop line incident and those related to both the drop line and power surge claims. The fees related exclusively to the drop line incident totaled $29,684.23. Of the remaining fees, appellee's counsel asserted that because appellee had initially pursued two types of claims, it should be awarded 50 percent of that amount.
 {¶ 67} Appellant countered that because appellee had initially filed claims against it regarding five separate incidents, four power surges and the one static line drop, and because the claims related to the four power surges had all been dismissed, appellee was only entitled to 20 percent of the fees related to the two categories of claims.
 {¶ 68} In awarding appellee attorney fees, the lower court accepted appellee's assessment of the fees and expressly found that the appropriate allocation of fees was 50 percent for the fallen power line case, and 50 percent for claims related to power surges. Accordingly, the court awarded appellee $29,684 for fees incurred for trial preparation and post-trial matters, and $22,779, as 50 percent of the $45,558 balance. Appellant only challenges the court's award of $22,779.
 {¶ 69} "The trial court's decision as to the appropriate level of attorney fees will not be reversed on appeal absent an abuse of discretion." Murrell v. Williamsburg Local School Dist. (1993),92 Ohio App.3d 92, 97. "`Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere. The trial judge which participated not only in the trial but also in many of the preliminary *Page 27 
proceedings leading up to the trial has an infinitely better opportunity to determine the value of services rendered by lawyers who have tried a case before him than does an appellate court.'" Bittner v. Tri-CountyToyota, Inc. (1991), 58 Ohio St.3d 143, 146, quoting Brooks v. HurstBuick-Pontiac-Olds-GMC, Inc. (1985), 23 Ohio App.3d 85, 91.
 {¶ 70} Appellant essentially asserts that the percentage of attorney fees that the trial court awarded was unreasonable in view of the fact that appellee was unsuccessful in its pursuit of claims regarding four out of five incidents. In Hensley v. Eckerhart (1983), 461 U.S. 424, the United States Supreme Court addressed the issue of whether a partially prevailing party may recover attorney fees for legal services on unsuccessful claims in a Section 1988, Title 42, U.S. Code action. In evaluating the factors that a court must look to, the court noted that while fees may not be awarded for services related to unsuccessful claims, in some cases, "the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead, the * * * court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." Id. at 435.
 {¶ 71} The record reveals that throughout the litigation below, the parties treated the power surge incidents similarly and separately from the drop line incident. In appellant's motion for summary judgment, it discussed power surges and circuit interruptions, noting that they are an expected and common occurrence on an electric *Page 28 
distribution and transmission system. Appellant further stated that a number of faults are caused by conditions beyond the company's control, such as weather, auto accidents, vandalism, animals, and trees or other objects contacting a line. This discussion was separate from appellant's treatment of the drop line incident. Although appellee also asserted a negligence claim against appellant regarding the drop line incident, the bulk of the parties' arguments regarding that occurrence dealt with the indemnification agreement. Accordingly, we cannot say that the trial court's award of 50 percent of the attorney fees attributable to the combined claims was unreasonable or arbitrary.
 {¶ 72} We do find, however, one error in the trial court's award of attorney fees. Upon review of the record, we cannot discern where the lower court deducted the fees that appellee admitted were clearly not applicable to the line drop incident. In reviewing its fee statements before the lower court, appellee highlighted in pink those fees for which it was not requesting an award. By our calculations, this amount totaled $4,399. Appellee stated at the hearing below that its request for attorney fees did not include this amount, yet the total amount of the invoices, $75,242, included the amounts highlighted in pink. This is the figure from which the lower court calculated the fee award, yet the court did not deduct the amounts highlighted in pink. Because those fees were exclusively related to unsuccessful claims, the court erred in failing to deduct them before calculating the award of attorney fees. Accordingly the fourth assignment of error is well-taken in part. *Page 29 
 {¶ 73} Finally, in its fifth assignment of error, appellant challenges the trial court's calculation of the prejudgment interest award. The trial court computed the amount of prejudgment interest owed based on when appellant received notice of the charges. As such, the court awarded appellee interest on the following amounts as follows:
 {¶ 74} On $14,434.95 from March 8, 2000 to August 27, 2001
 {¶ 75} On $43,528.95 from August 28, 2001 to February 15, 2006
 {¶ 76} On $71,240.71 from February 16, 2006 to July 27, 2006
 {¶ 77} The interest rates applicable to these time periods varied, resulting in a total interest award of $19,569.11. Appellant does not dispute that it was notified of the $14,434.95 charge as of March 8, 2002. Rather, appellant contends that the trial court erred in awarding appellee interest on $29,094 ($43,528.95 minus $14,434.95) from August 28, 2001, because the record reveals that appellee did not present appellant with these charges until October 3, 2005.
 {¶ 78} An award of prejudgment interest as to claims arising out of breach of contract is governed by R.C. 1343.03(A). Galmish v.Cicchini (2000), 90 Ohio St.3d 22, 33. Prior to June 2, 2004, R.C.1343.03(A) provided in pertinent part as follows:
 {¶ 79} "* * * when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, *Page 30 
and no more, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract."
 {¶ 80} We have held that prejudgment interest under R.C. 1343.03(A) is based on the premise that a party to a contract should not retain the use of money owed under a contract when that amount is due and payable to the other contracting party. Kott Enterprises, Inc. v. Brady, 6th Dist. No. L-03-1342, 2004-Ohio-7160, ¶ 72, citing Miller v.Gunckle, 96 Ohio St.3d 359, 2002-Ohio-4932, ¶ 28; Luft v. Perry Cty.Lumber Supply Co., 10th Dist. No. 02AP-559, 2003-Ohio-2305, ¶ 46. That is, "[t]he award of prejudgment interest is compensation to the plaintiff for the period of time between accrual of the claim and judgment, regardless of whether the judgment is based on a claim which was liquidated or unliquidated and even if the sum due was not capable of ascertainment until determined by the court." Royal Elect. Constr.Corp. v. Ohio State Univ. (1995), 73 Ohio St.3d 110, the syllabus. Further, under R.C. 1343.03(A), the trial court does not have discretion in awarding prejudgment interest. Kott, ¶ 73, citing Slack v.Cropper (2001), 143 Ohio App.3d 74, 85. Rather, "the right to prejudgment interest in a contract claim is a matter of law, [and] the amount awarded is based on the court's factual determination of an accrual date and interest rate. These factual decisions will be reviewed on appeal under an abuse of discretion standard." Dwyer Elec, Inc. v.Confederated Builders, Inc. (Oct. 29, 1998), 3d Dist. No. 3-98-18, citing Cincinnati Ins. Co. v. First Natl. Bank (1980),63 Ohio St.2d 220. *Page 31 
 {¶ 81} The record reveals that appellee first presented appellant with an invoice for the damages caused by the line drop on March 8, 2000. That invoice states that the amount then due was $14,434.95 and was for property damaged as a result of an accident on December 16, 1999. Subsequently, on August 30, 2001, Dwight Spratley, appellee's claim agent, sent appellant two invoices, the March 8, 2000 invoice for $14,434.95, and a second invoice dated August 27, 2001, for $35,304.[3] Both invoices stated that they were for labor and material charges necessary to repair Norfolk's property damaged as a result of the December 16, 1999 accident. Both invoices referenced the claim number TOLEDO121699CB. The cover letter to those invoices, however, referenced the June 4, 2000 and July 27, 2000 power surge incidents and associated the $35,304 charge to those incidents.
 {¶ 82} In awarding appellee prejudgment interest on $29,094 from August 27, 2001, the lower court necessarily determined that this was the date upon which appellee's claim for this amount accrued and this was the amount that would make appellee whole. Upon review, we cannot say that the lower court abused its discretion in making this determination. But for an error in the cover letter attached to the invoice, or if appellee had simply mailed appellant the invoice without a cover letter, appellant would have no argument. The invoice clearly states that the charges are for labor and materials necessary to repair property damaged as a result of the December 16, 1999 accident. *Page 32 
Accordingly, the trial court did not err in awarding appellee prejudgment interest on $29,094 from August 27, 2001, and the fifth assignment of error is not well-taken.
 {¶ 83} On consideration whereof, the court finds that substantial justice has not been done the party complaining and the judgment of the Lucas County Court of Common Pleas is reversed in part. Pursuant to App.R. 12(B), the trial court's award of attorney fees is hereby modified and appellee is awarded attorney fees of $50,263. The judgment of the trial court is affirmed in all other respects. Appellant and appellee are ordered to share equally the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT REVERSED, IN PART, AND AFFIRMED, IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Mark L. Pietrykowski, P.J., Arlene Singer, J., William J. Skow, J., CONCUR.
[1] Norfolk had earlier filed a complaint regarding the December 16, 1999, July 27, 2000, and March 2, 2000 incidents, but then dismissed that case and refiled the action adding claims for the 2002 incidents.
[2] Although appellant's eighth assignment of error is not listed in the Assignments of Error portion of its brief, it is stated in the text of the brief and misnumbered as Assignment of Error No. 9. Nevertheless, we have stated it herein and renumbered it as the eighth assignment of error for the sake of clarity.
[3] The total for these two invoices, $49,738.95, was subsequently reduced to $43,538.95 when Norfolk's accountant discovered a double charge for 7,000 feet of track circuit wire. *Page 1